DENTON MANUFACTURING COMPANY, INC. *v.* HENDERSON

No. 42163          February 5, 1962          137 So. 2d 196

*Jacobs, Griffith* and *Hatcher,* Cleveland; *Neill, Clark & Townsend,* Indianola, for appellant.

*P. J. Townsend, Jr.,* Drew, for appellee.

GILLESPIE, J.

Appellant, Denton Manufacturing Company, Inc., filed its original bill of complaint in the chancery court. Upon motion of defendant, A. A. Henderson, the case was transferred to circuit court. From an adverse judgment in the circuit court, Denton Manufacturing Company, Inc. appeals.

The complainant charged that the cause of action arose out of a course of dealing between appellant, Chemell Hatching Egg Service, Inc., a Georgia corporation, hereinafter called Chemell, and appellee, which began August 29, 1958, when appellant sold appellee 970 pullets for a price of $1,358.00 to establish appellee in the egg business; and that appellant sold appellee chicken feed, medication and supplies thereafter through May 1959. An itemized account of debits totalling $5,866.65 was attached to the complaint. The account showed credits of $2,462.17, leaving a balance claimed to be due by appellee of $2,404.48.

Appellee filed an answer and counterclaim in which he denied generally that he was indebted to appellant. Appellee charged that under a verbal contract with appellant he constructed a chicken house at the cost of $3,066.37; that appellant was obligated to furnish feed, medication and supplies, and make payments on the chicken house loan until the chickens began to lay, after which appellant would be repaid from the sale of eggs; that appellant contracted to purchase all the eggs produced by appellee's chickens at a minimum price of 60¢ per dozen and a maximum price of 80¢ per dozen, with a guaranteed average price of 70¢ per dozen, based on hatchability. Appellee contended that he was damaged to the extent of $4600 but it does not appear how he

arrives at the damages. Appellee admitted purchases from appellant totalling $5,767.38, against which he claimed credits of $5,637.80, plus damages of $4,600.00, leaving appellant owing appellee $4,470.42.

The jury returned a verdict as follows: "We, the jury, find for the defendant in the amount of $2,404.48, to be applied on A. A. Henderson's account with Denton Manufacturing Company." In effect, the jury found that appellee owed appellant nothing and judgment was entered accordingly.

It is undisputed that in the early part of 1958 appellant decided to promote the commercial egg production business. Appellant was a dealer for Purina Feeds and its principal reason for promoting the commercial egg production business was in order to sell feed. Max E. Bruce was placed in charge of that part of appellant's business and was authorized to make contracts on behalf of appellant. An arrangement or contract was made between appellant and Chemell whereby Chemell would purchase the eggs for hatching broiler chicks. The price to be paid the producers of the eggs would depend on the price of the broiler chicks and upon the percentage of the eggs that hatched. Appellant would furnish the producers a sufficient number of roosters. Appellant also installed in its place of business at Shelby a cooling room with the necessary apparatus to preserve the eggs until they were picked up by Chemell. Appellant was to receive from Chemell 10¢ per dozen for all eggs purchased by Chemell in consideration of appellant's furnishing the roosters and the egg collecting point.

After appellee and about ten other producers began producing eggs, they were delivered at appellant's collecting station twice weekly and were picked up by Chemell. The producer would get a receipt when the eggs were delivered at appellant's collecting station and Chemell would remit to appellant at intervals for all

eggs purchased by it, and upon making such remittance Chemell would show the quantity and price as to each producer. Then each producer, including appellee, was sent a notice showing the quantity of eggs, the price, and the credit to their respective accounts. Most of the contracts between the producers and appellant were written; the one with appellee was oral.

Appellee was the owner of a small farm. Bruce, appellant's agent, went to see appellee in the spring of 1958 in reference to the commercial egg production business. A representative of the Purina Feed Company was with Bruce. Bruce talked to appellee and one of his neighbors and stated that appellant had a deal whereby appellee could make some money in the commercial egg production business. Appellee was interested. Thereafter appellant invited appellee and some forty other farmers to a meeting at DeSoto Lake. At this meeting, Bruce had general charge and he produced a chart showing that hatching eggs were selling at a maximum of 80¢ per dozen and a minimum of 60¢. The chart indicated that 80¢ was the current price for eggs and they had not been known to go below 60¢ per dozen, with the average price of 70¢ per dozen. Bruce made it known that the producer would have to furnish a chicken house and appellant would furnish the chickens and the feed until the chickens went into production, and that appellant would receive and handle the eggs.

Sometime after the DeSoto Lake meeting, Bruce talked to appellee and another prospective producer. Appellee told Bruce that he was ready to go into the deal if he could be assured of the prices mentioned at DeSoto Lake, and, according to appellee, Bruce told him, ''I will assure you that you can't get less than 60¢ a dozen for your eggs, and on an average of 70¢, and there is not a way in the world you can't make money out of it.'' Bruce told appellee how to get his chicken house built on an FHA loan, and appellee had a house built at a

cost of $3,066.37, payable in monthly installments, which appellant paid until appellee's chickens came into egg production. These payments were charged to appellee and is a part of the account sued on.

Appellee stated that when he finally decided to go into the commercial egg production business he talked to Bruce and the following conversation took place: "The last conversation we had before I built my house and decided to trade with him, I asked Max Bruce the specific question: 'Is this 60¢ a dozen — you say I cannot get less?' He said, 'I say you cannot get less than 60¢ a dozen; on an average you will get 70¢ all the way through. Sometimes you will get 80¢ and sometimes in the 60's. I traded right there and went and signed up for my house." This occurred sometime about May 21, 1958.

On August 29, 1958, appellee purchased from appellant 970 young chickens. They came into egg production in December and produced 6180 dozen eggs between that time and June 4, 1959, on which date appellant picked up the hens at appellee's request and sold them at the best price appellant could get for them. After appellee's chickens went into production he took, or sent, the eggs to appellant's collection station twice a week and received a receipt therefor. Chemell bought the eggs and sent Denton remittances therefor along with remittance for other producers showing the quantity and price of each producer's eggs. Appellee was credited with the amount thus reflected as to his production and received notice of the quantity and price. After the first notice appellee received showing the price of eggs was less than 60¢ per dozen, he talked to Bruce, complaining of the price, and Bruce told him that he would probably get more when the hatchability of the eggs was determined. He talked to Bruce several time thereafter.

The price of hatching eggs declined sharply about the time appellee's hens came into production, and the

commercial egg production business was unprofitable during the entire time that appellee had his chickens. On June 4, 1959, appellant was requested by appellee to come get the chickens and appellant did this, and the chickens were sold for $687.50, leaving a balance owing by appellee of $2,404.48, according to appellant's contention. This suit was filed on April 26, 1960.

The record shows that before appellee went into the commercial egg production business he not only talked to Bruce but he talked to others who were interested in going into this business, and at least one who was already in it. At that time prices for eggs were good and the business was profitable. Appellee was told by several people that it looked like a good proposition.

The first question is whether appellee established that appellant contracted to buy the eggs produced by appellee at an average price of 70¢ per dozen rather than the prices paid by Chemell. If appellee is correct in this, he would be entitled to an additional credit of $1,545.00 on his account.

Since the jury found for appellee, all conflicts must be resolved in appellee's favor and the evidence must be viewed in the light most favorable to appellee. We are of the opinion that appellee's testimony does not establish an obligation on the part of appellant to purchase appellee's eggs for an average price of 70¢ per dozen. Appellee testified in answer to a question as to who was purchasing his eggs that "I don't know particularly who I was selling them to." He also testified that he knew the price of eggs would fluctuate but contended they were not to go below 60¢ per dozen. When appellee's testimony is considered in connection with the undisputed proof, it seems clear to us that the statements made by Bruce as to the price appellee would receive for his eggs were representations of anticipated future prices based on past experience. Bruce's assurances were not contractual and nowhere did appellee

testify that appellant contracted or agreed to purchase his eggs.

Appellee's testimony shows further that he claimed credit or damages based on representations he claimed Bruce made that feed prices would remain at $72.00 per ton, that chickens would have a certain lay period, and that when the chickens stopped laying they would bring about $1.80 each. All these statements were in the same category as Bruce's assurances as to the prices of eggs, and all referred to the future and were not contractual.

Appellee does not contend that the representations made by Bruce were fraudulent, and there is nothing in the record to indicate that they were not made in good faith. No representations relating to present or pre-existing facts were made; all were matters of futurity.

We hold, therefore, that appellee failed to meet the burden of establishing the alleged contract on the part of appellant to purchase appellee's eggs at an average price of 70¢ per dozen.

The only other issue requiring any discussion is that involving the credit appellee claims he should have received from the sale of the hens on June 4, 1959. He bases this contention on the fact that Bruce represented to him that when the hens stopped laying they would bring about $1.80 each. Appellant credited appellee with $687.50 for the sale of the chickens. The chickens were picked up by appellant at appellee's request and the proof shows without dispute that Bruce sold the chickens at the best price obtainable, which was 12½¢ per pound. Appellee claims in his pleadings that he should have received credit for $970.00, which was later amended to $920.00. It is clear to us that appellee failed to meet the burden of showing that he did not receive proper credit for the sale of the hens.

After the verdict, appellant filed a motion to set the verdict aside and enter judgment for appellant in the

amount sued for and this was in substance a motion for judgment nothwithstanding the verdict and should have been sustained. Appellant was entitled to judgment for $2,305.21, or $99.27 less than the amount sued for. There was a dispute as to the debits to appellee's account only as to said sum of $99.27. Accordingly, the case is reversed and judgment entered here for appellant in the sum of $2,305.21.

Reversed and judgment here for appellant.

*Lee, P. J.,* and *Kyle, McElroy* and *Jones, JJ.,* concur.